# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| GEORGE E. EAGLESON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-CV-03369-NKL |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff George Eagleson ("Eagleson") challenges the Social Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and under Title XVI for supplemental security income.

Eagleson's initial application was denied, and he appealed the denial to an administrative law judge ("ALJ"). On May 13, 2009, following an administrative hearing, the ALJ found Eagleson was not "disabled" as that term is defined in the Act. The Appeals Council denied Eagleson's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Eagleson argues that the record does not support the ALJ's finding that he was not

under a disability because (1) the ALJ did not properly evaluate the opinions of Eagleson's treating physician; and (2) the ALJ improperly concluded that Eagleson suffered from no severe impairment. Because this Court finds no reversible error in the ALJ's decision, Eagleson's Complaint [Doc. # 3] is denied.

## I.     Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the time of the hearing, Eagleson was forty-nine years old with a high school education. Eagleson alleges that he became disabled on August 15, 2006. Eagleson previously filed applications for disability insurance benefits on July 7, 2004, alleging disability beginning on July 31, 2001. These applications were denied by an ALJ on August 14, 2006, the day before Eagleson now claims he became disabled in this case. Eagleson has not argued for reopening of his previous claims.

Eagleson claims he became disabled because of bipolar disorder, a neck injury, a torn rotator cuff, knee pain, asthma, and high blood pressure.

### A.     Medical Records

Eagleson's primary care provider, Dr. Michael Good diagnosed him with anxiety, alcohol abuse, and depression in May 2003, based on Eagleson's reported history. In December 2003, Dr. Good diagnosed Eagleson with depression and Bipolar disorder and prescribed an anti-psychotic medication and an anti-depressant. Dr. Good reported

---

[1] Portions of the parties' briefs are adopted without quotation designated.

Eagleson's mental status and behavior as "normal." Eagleson has a history of alcohol abuse. He attended group therapy with his girlfriend between November 2003 and January 2004 in an effort to control his drinking.

In November 2003, Eva Wilson, Psy.D., conducted a psychological evaluation. Eagleson reported that he had stopped working in April 2002 because of severe depression and inability to concentrate. Dr. Wilson diagnosed Eagleson with severe, recurrent major depression based on the history he provided, but she noted that symptoms of the disorder were not evident during the visit. She also expressed the opinion that Eagleson was "possibly highly exaggerating his mental problems." (Tr. 186). She recommended medications and psychotherapy.

On April 5, 2004, Eagleson complained of depressed and anxious mood during his examination with Dr. Good. On May 6, 2004, Eagleson went to White Oak Medical for a follow up examination for blood pressure and medication check. Dr. Good increased his dosage of Effexor.

On August 27, 2004, Mr. Eagleson reported having an asthma attack. Dr. Good examined Eagleson on November 22, 2004, for pain in his tailbone following a fall. Dr. Good prescribed Tramadol for pain and refilled his prescription for Zyprexa. Eagleson was examined by Dr. Good on April 19, 2005, and Dr. Good ordered an x-ray due to shoulder pain.

On May 3, 2005, Eagleson presented to the emergency room at St. John's Hospital with a right knee injury. An x-ray revealed a large amount of joint fluid. He was diagnosed

with a knee sprain and discharged with crutches and a prescription for Vicodin. Eagleson was examined by Dr. Good on May 5, 2005 for follow up after emergency room visit for knee injury. A MRI of the right knee on May 6, 2005 revealed a tear of the ACL at its proximal portion associated with moderate joint effusion as well as a sprain of the medial collateral ligament.

A MRI of the left shoulder on May 6, 2005 revealed partial thickness tears greater than 50% involving the undersurface of the supraspinatus and infraspinatus tendons. On May 12, 2005, Dr. Good referred Eagleson to Dr. Rogers for further treatment of his left shoulder. Dr. Rogers examined Eagleson on May 17, 2005 and diagnosed a rotator cuff in the left shoulder with subtropical impingement. Examination revealed tenderness over the anterior shoulder and mild tenderness posterior. A MRI of the left shoulder revealed a very prominent anterior acromial spur. Dr. Rogers elected to give Mr. Eagleson an injection.

On May 25, 2005, Eagleson was seen by Dr. Good for right knee pain. On June 20, 2005, Eagleson was examined for right knee pain. Dr. Good prescribed Lorcet for pain and referred Eagleson to Dr. Roeder for further evaluation.

Eagleson consulted Edwin Roeder, M.D., in June 2005 after he injured his right knee. Dr. Roeder diagnosed a tear of Eagleson's anterior cruciate ligament, but he did not see a great degree of instability in the knee, and he recommended physical therapy instead of surgery. Eagleson returned to Dr. Roeder in December 2005 complaining of pain in his left shoulder that had persisted for three years. Dr. Roeder diagnosed a torn rotator cuff, which he repaired surgically in January 2006. Dr. Roeder released Eagleson to work in February

4

2006, telling him to "go back and see what he can do."

In January 2006, Sharol McGehee, Psy.D., conducted a psychological evaluation to determine whether Eagleson met the criteria for medical assistance. Based on her testing, Dr. McGehee concluded that Eagleson suffered from severe alcoholism, a "high level" of depression, and "less than adequate contact with reality." (Tr. 243). She concluded that he met the criteria for medical assistance.

Steven T. Akeson, Psy.D., performed a consultative psychological examination in February 2006 at the request of the state Disability Determinations Service ("DDS"). Dr. Akeson considered 197 pages of records, in addition to his interview and observations of Eagleson. Eagleson reported that he could take care of all his personal needs, including his own medication management. He reported that he was "kind of down" on the day of the examination, but Dr. Akeson noted a tranquil mood with full range of affect, clear speech, and clear thought processes. (Tr. 261). Eagleson completed several cognitive exercises successfully.

Dr. Akeson diagnosed a single episode of major depressive disorder, in full remission; alcohol dependence; polysubstance dependence, in full sustained remission; nicotine dependence; and caffeine related disorder. He concluded that Eagleson could understand and remember complex instructions; sustain concentration and persistence with complex tasks; interact socially and handle normal work stress, despite his alcohol dependence; adapt to his environment; and manage his own funds. Therefore, he concluded that Eagleson's ability to perform work-related functions was unimpaired. Dr. Akeson expressed doubt about

5

Eagleson's veracity, based on his previous reports of serving in the Special Forces in Vietnam, despite the fact that he was born in 1958.

In a function report completed in October 2006 in conjunction with his SSI application, Eagleson stated that he spent about three hours a day feeding horses, and he also did laundry, cooked, washed dishes, shopped for groceries, and mowed the lawn. He stated that he enjoyed riding horses "as much as possible." (Tr. 161). He complained of a short memory and claimed that he was limited to lifting 10 pounds.

Dr. Wilson submitted a medical source statement in September 2006. She listed the "date of first evaluation or treatment" as November 2003, the date of her psychological evaluation, and she listed no other dates of evaluation or treatment. (Tr. 427). She stated that Eagleson was moderately or markedly limited in several areas of mental functioning and that he would not have the ability to understand, remember, and carry out simple instructions or make simple work-related decisions.

In February 2007, Eagleson suffered a vascular injury to his right hand as a result of frostbite, aggravated by his nicotine consumption. Dr. Good prescribed medication and advised Eagleson to quit smoking. At a follow-up visit, Dr. Good noted that the condition of Eagleson's hand had improved.

Later that month, Eagleson visited Dr. Good and requested that he fill out a residual functional capacity ("RFC") assessment. Eagleson denied any pain relating to the reason for the visit. In the RFC assessment, Dr. Good stated that Eagleson could lift 10 pounds frequently, 25 pounds occasionally, and stand or walk for 4 hours in an 8-hour workday. Dr.

Good did not estimate how many hours Eagleson could sit, stating instead "[n]ot done in his line of work." He stated that Eagleson could never climb, balance, stoop, kneel, crouch, or crawl, and he was limited in his ability to reach, handle, finger, feel, see, and hear. Addressing Eagleson's environmental restrictions, Dr. Good stated only that "[a]round lot of people cause anxiety," "cold causes stiffness," and "[history] of frostbite presently." (Tr. 459). He predicted that Eagleson would need to take frequent, unscheduled breaks during the workday and that he would miss more than 4 days per month because of impairments or treatment.

In May 2007, Eagleson returned to Dr. Good for medication refills and reported that he was "very active" and "love[d] work." Dr. Good listed Eagleson's occupation as "fence builder." (Tr. 497-98).

In December 2007, Eagleson went to the emergency room complaining of chest pain, but he left against medical advice, explaining that he needed to take care of his dog. Later that month, Dr. Good referred Eagleson for a cardiac stress test, which yielded normal results. In July 2008, Eagleson visited the emergency room complaining of chest pain, but he left against medical advice before a diagnosis could be completed.

In December 2008, Eagleson visited a Robert Marsh, ARNP, at the Fordland Clinic complaining of a sore throat. On February 3, 2009, Eagleson returned, complaining of depression and "nerves." Dr. Marsh completed a RFC on February 6, 2009, opining Eagleson retained the ability to stand for two hours throughout a normal workday, sit for one hour throughout an eight hour workday, he could never kneel, only occasionally climb,

balance, stoop, crouch and crawl due to back pain, and needed to take an unscheduled break every 30 to 45 minutes for 15 minutes at a time.

### B.     Eagleson's Testimony

On Feburary 12, 2009, Eagleson appeared in front of Administrative Law Judge Kenton W. Fulton. At the administrative hearing, Eagleson testified that he had worked full-time pouring concrete from October 2007 to March 2008, and in that job he lifted up to 80 pounds. He stopped working at the job because he could no longer handle the physical demands.

From 2001 to 2006, he worked part-time as a farm hand, in exchange for room and board. He fed and watered horses, lifting up to 50 pounds. He had also worked as a truck loader, lifting up to 60 pounds; and as a store clerk, lifting up to 20 pounds; as a packager; in construction cleanup, lifting up to 25 pounds; as an assembly line supervisor, lifting up to 60 pounds; and as a machine operator, lifting up to 100 pounds. Eagleson testified that he had been unable to work since July 2008 because of a heart attack. Between March 2008 and July 2008 he was "just laying back," waiting on the outcome of his Social Security claim.  (Tr. 37-38). He had been told that he wasn't allowed to work.

Eagleson testified that he was supposed to set up an appointment with a cardiologist. He estimated that he could lift about 20 pounds, but he could lift 50 pounds or more before the heart attack. He could walk about 100 yards, but he could "walk like crazy" before the heart attack.  (Tr. 39). He could stand comfortably for up to two hours at a time, but before the heart attack he had no limitations on his ability to stand. He could sit comfortably for

only 20 minutes at a time, because his legs went numb. Since the heart attack, he was able to bend, stoop, or squat, but not as frequently as he had before the heart attack. He had numbness in his right hand after he suffered a broken neck in 1995. He had surgery on his right rotator cuff two years previously, and after the surgery, he was no longer able to lift 50 pounds regularly. He believed that, before his heart attack, he would have been able to do a desk job that required him to sit for six hours in an eight-hour day.

Eagleson stated that he experienced pain daily in his legs, back, and neck, and he rated the pain as six or seven on a scale of one to ten. He did not take medications to relieve the pain, because he had been a drug addict–he had stopped using illicit drugs in 1993–and he didn't want to get "hooked" on pills. (Tr. 41). He had obtained treatment for alcohol abuse and had "slowed down" his drinking to one six-pack a week. (Tr. 42). Reducing his alcohol consumption did not result in an improvement in his symptoms or his functional capacity. He had trouble remembering appointments.

At home, Eagleson testified he helped his wife with dishes, cooking, cleaning, and removing the trash. He was responsible for mowing the lawn. Before his heart attack, he also mowed his neighbors' lawns for no compensation, because he needed something to do. He took care of his own personal grooming. He once enjoyed hunting, but he no longer did it because he didn't have the patience to "sit there and wait." (Tr. 44). He continued to attend church twice every Sunday, even though he got tired when he had to sit for too long.

## II.   The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

> The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that Eagleson was not disabled. At step one, he determined that Eagleson was not engaging in substantial gainful activity since September 13, 2006.

At step two, the ALJ determined Eagleson has following medically determinable impairments: history of rotator cuff tear, status post arthorscopic surgery; history of ligament tear of the right knee; chest pain; hypertension; depression; alcohol abuse and personality disorder, not otherwise specified.

At step three, the ALJ determined that Eagleson did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, concluding that Eagleson did not have a severe impairment or combination of impairments. Therefore, the ALJ found that Eagleson was not disabled.

## III. Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable

mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

## IV. Discussion

Eagleson argues that the ALJ because (1) ALJ did not properly evaluate the opinions of Eagleson's treating physician; and (2) the ALJ improperly concluded that Eagleson suffered from no severe impairment. This Court finds no reversible error in the ALJ's decision.

### A. The ALJ Gave Proper Weight to Treating Medical Sources

Eagleson argues that the ALJ failed to give proper weight to medical source statements completed by Dr. Good, Dr. Wilson, and Dr. McGehee. The Court concludes that the ALJ

11

properly considered each medical source opinion and assigned each the weight it merited under the circumstances.

The ALJ properly discounted Dr. Good's February 2007 RFC assessment because it was not consistent with the other evidence, including Dr. Good's treatment notes and Eagleson's testimony. Contrary to Dr. Good's assessment, there is no evidence that he or any other medical provider had ever placed long-term limitations on Eagleson's ability to lift, stand, walk, climb, balance, stoop, crouch, crawl, manipulate objects, see or hear. Many of Dr. Good's alleged limitations, such as standing, seeing, and hearing, are unrelated to any diagnosis in the record.

It is revealing that, during the same visit in February 2007, Eagleson denied any pain, and three months later he reported being "very active" and loving his work as a fence builder. At the administrative hearing, Eagleson contradicted Dr. Good's assessment when he testified that he had robust physical abilities before his alleged heart attack in July 2008. The ALJ properly gave little weight to Dr. Good's RFC assessment, because it was not supported by the medical evidence. See 20 C.F.R. § 416.927(d)(3); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) ("For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'"(citation omitted)).

Eagleson points out that Dr. Good wrote a letter in July 2006 stating that Eagleson needed an air conditioner because of "health problems." (Tr. 294). However, in his medical source statement, Dr. Good did not mention any environmental limitations or medical

12

conditions related to heat or humidity.

The ALJ correctly pointed out that Dr. Wilson's assessment was based on a single examination of Eagleson conducted nearly three years earlier. Therefore, Dr. Wilson's assessment does not constitute substantial evidence. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). The records of Dr. Wilson's November 2003 evaluation make it clear that her conclusions were based entirely on Eagleson's "possibly highly exaggerat[ed]" reports, and she noted that none of his alleged symptoms were evident during the examination. Moreover, Dr. Wilson conducted the examination on which she based her opinion long before the relevant time period, and therefore its value would be limited, aside from its other defects. *See* 20 C.F.R. § 416.335.

Dr. McGehee's psychological evaluation was conducted to determine Eagleson's eligibility for medical assistance, and therefore it did not address work-related functional limitations. There is no indication that Dr. McGehee considered Eagleson's medical records, as Dr. Akeson did, and therefore her conclusions were less reliable than Dr. Akeson's. As the ALJ correctly pointed out, the fact that Dr. McGehee found Eagleson eligible for medical assistance is not binding for purposes of a Social Security disability determination. *Cf.* 20 C.F.R. § 416.904; *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996) (whether a claimant is disabled under state law is not binding on the Commissioner).

The ALJ went on to examine all evidence of record as required by the regulations, including the objective medical evidence, Eagleson's subjective complaints, his credibility, his daily activities, and the nature of his medical treatment, before determining that he had no

severe impairments. "'To require a more elaborate articulation of the ALJ's thought processes would not be reasonable.'" *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) (quoting *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)). The medical evidence, combined with the evidence of Eagleson's daily activities, does not support the existence of significant functional limitations. *See* 20 C.F.R. § 416.929(c)(4).

**B.     The ALJ Properly Determined Eagleson Had No Severe Impairments**

The ALJ found that none of Eagleson's medically determinable impairments, or any combination of his impairments, significantly limited his ability to perform basic work-related activities, and therefore he was not disabled. The sequential evaluation process may only be terminated at step two when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to perform basic work activities. See 20 C.F.R. § 416.921(a); *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996). "Basic work activities" include physical functions such as walking, standing, lifting, reaching and carrying; capacities for seeing, hearing, and speaking; the mental abilities of understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. See 20 C.F.R. § 416.921(b).

Eagleson argues that his impairments were severe because there were various medical diagnoses in the record, including depression, bipolar disorder, hypertension, and a history of a rotator cuff tear. A history of diagnoses or medical treatments is not in itself sufficient to establish a severe impairment. As explained in 20 C.F.R. § 416.921, there must also be

14

evidence of significant limitations on a claimant's ability to do basic work activities. The ALJ thoroughly reviewed the evidence of record and properly determined that there was no credible evidence establishing such limitations.

The medical evidence is not consistent with a severe rotator cuff tear or severe hypertension, as Eagleson argues. The ALJ properly found that both conditions were medically determinable impairments, but they were not severe. Treatment records show that Eagleson recovered fully from his rotator cuff surgery, that he was released for work with no limitations, and that he did not seek follow-up treatment. Eagleson performed physically demanding work as a fence builder and a concrete laborer after recovering from the shoulder surgery. There is no evidence that Eagleson's hypertension has imposed any limitations on his ability to work, and Dr. Good did not even mention the condition in his February 2007 medical source statement.

The ALJ properly found Eagleson to have the medically determinable impairments of depression and personality disorder, but neither impairment was severe. To support his determination, the ALJ specifically addressed each of the "paragraph B criteria" of the psychiatric review technique. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00C. Based on all of the evidence of record, including the highly credible assessment of Dr. Akeson, the ALJ determined that Eagleson had only mild limitations on his activities of daily living; social functioning; and concentration, persistence and pace. He correctly observed that Eagleson had experienced no episodes of decompensation. Ratings of "none" or "mild" in the paragraph B criteria indicate that a mental impairment is not severe. *See* 20 C.F.R. §

416.1520a(d)(1). Notably, Eagleson did not testify that he had any mental limitations, other than difficulty in remembering his appointments, and there is no evidence that Eagleson's mental disorders have ever imposed significant limitations on his ability to work.

As discussed above, the ALJ found numerous inconsistencies between Eagleson's allegations and the other evidence of record, including Eagleson's own hearing testimony and the medical records. *See Johnston v. Apfel*, 210 F.3d 870, 875 (8th Cir. 2000) ("The inconsistencies between [Plaintiff's] subjective complaints, the medical record and her daily activities supported the ALJ's finding that her impairments were not severe"). The ALJ also considered Eagleson's daily activities and his admission that he had performed physically demanding employment during the period of alleged disability. *See Gwathney v. Chater*, 92 F.3d 672, 677 (8th Cir. 1996) (Physically demanding tasks such as housework and employment requiring shelf stacking contradicted Plaintiff's claim that she could not perform basic work activities).

## V. Conclusion

Because this Court finds no reversible error in the ALJ's decision, Eagleson's Complaint [Doc. # 3] is DENIED.

s/ NANETTE K. LAUGHREY  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 9, 2010  
Jefferson City, Missouri